J-S63040-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| KASHIF M. ROBERTSON, | |
| Appellant | No. 1730 MDA 2013 |

Appeal from the Judgment of Sentence September 19, 2013
in the Court of Common Pleas of Dauphin County
Criminal Division at No.: CP-22-CR-0002526-2012

BEFORE:  BOWES, J., PANELLA, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                **FILED DECEMBER 16, 2014**

Appellant, Kashif M. Robertson, appeals from the judgment of sentence entered September 19, 2013, following his jury conviction of possession with intent to deliver (PWID), possession of drug paraphernalia, and possession of a controlled substance.[1]  On appeal, Appellant challenges the denial of his motion to suppress and the denial of his motion to dismiss the charges on double jeopardy grounds.  For the reasons discussed below, we affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 35 P.S. §§ 780-113(a)(30), (32), and (16), respectively.

We take the underlying facts and procedural history in this matter from the suppression court's January 23, 2014 opinion and the trial court's December 16, 2013 opinion.

A [s]uppression hearing held on December 19, 2012[,] established the following facts:  On April 7, 2012, around 12:30 a.m., Dauphin County Adult Probation Officer Travis Banning ("APO Banning") was patrolling with Officer Darrin Bates ("Officer Bates"), a member of Harrisburg Bureau of Police ("HBP") Street Crimes Unit [SCU].  That night, APO Banning and Officer Bates were in the area of 17 Row Hall Manor because Banning received information from a confidential informant ("CI") that an individual wanted by the Harrisburg police on a simple assault warrant named Corey Sellers ("Sellers") would be there.  APO Banning testified that the information was received from a known informant, not an anonymous source.  The [CI] informed Banning that not only would Sellers be in the area of 17 Row Hall Manor, but also he would be travelling with Appellant in his green Chrysler vehicle.  APO Banning stated, based on past experience, he was familiar with [Sellers] and knew him to have prior arrests for drug and firearms violations. This information was passed on to Officer Bates.  It was Officer Bates understanding that Appellant would be in the area to see his son's mother.

APO Banning and Officer Bates described the events of the night.   Upon arriving [at] Hall Manor, [APO] Banning and [Officer] Bates observed a vehicle matching the description provided by the CI, a green Chrysler, backed into a parking space between 16 Row and 17 Row Hall Manor.   During his testimony, Appellant confirmed that he has a green Chrysler and on the night of his arrest, he was parked at 16 Row Hall Manor[,] which he estimated to be 30-50 feet from 17 Row. APO Banning got out of the police vehicle to read the vehicle registration plate, so he could run it on the computer through JNET. He determined that the vehicle was owned by [Appellant].

[APO] Banning and [Officer] Bates then moved further away in the parking lot to observe the vehicle without being seen.  The officers had a description of [Sellers] as being a black male with a thinner build measuring approximately 5'8" tall.  At

- 2 -

that point in time though, neither [APO] Bates nor [Officer] Banning had a picture to identify [Sellers].

While APO Banning was attempting to find pictures of Appellant and Sellers on the police laptop computer, he and [Officer] Bates observed two black males wearing dark clothing come out of Row 17 and proceed towards the green Chrysler; the thinner one on the passenger side and the stouter one on the driver's side. When the males approached the car, neither officer was able to tell if they were the individuals they had been looking for and, if so, who was Sellers and who was [Appellant], as APO Banning was still attempting to upload identifying photos. Officer Bates radioed other SCU units to assist in case one of the individuals was Sellers, and it became necessary to prevent his flight in the vehicle. Officer Bates also testified that his primary concern at that point was the fact that one of the two males was wanted for simple assault. On cross examination, Officer Bates and APO Banning acknowledged that upon initial approach, they had not observed any criminal activity on the part of the two males.

While at the car, the male who was later identified as Sellers entered on the passenger side while Appellant got in the driver's side then got out and was leaning into the rear seat of the car. Subsequently, Sellers got [out] of the car to speak to a nearby female who accompanied him back to the car. After looking into the rear seat of the car and moving items into the trunk, Appellant walked to the sidewalk. Officer Bates stated that, at this point in time, all responding police units converged in front of the green Chrysler. Sellers exited the vehicle and fled causing HBP Officer Jon Fustine to give chase and apprehend him. While the chase was occurring, Appellant was detained and placed in handcuffs by HBP Officer Hammer due to Sellers fleeing, so the officers could ascertain the individuals identities and maintain officer safety. Appellant was placed on the curb by his car. Appellant told Officer Hammer that he was not Sellers and provided his driver's license. Officer Bates turned his attention to the female who had remained in the car. He eventually released her because the purpose for being in that location was to find a wanted male individual and he did not suspect her of any criminal activity.

After the female was released, Officer Bates returned to the location where Appellant was being detained while Officer

Hammer was still in the police vehicle checking his identification in the NCIC, AOPC and Metro databases. When he came up behind Appellant, he was sitting on the curb, leaning on his right hip, with his left leg and left buttocks lifted off the curb. Officer Bates noticed Appellant reaching with his left pinkie finger towards his left front pants pocket where [Officer] Bates observed a plastic baggie protruding. Officer Bates testified that the Appellant was trying shove the baggie back into his pocket. Officer Bates took the baggie out of Appellant's pocket. When he retrieved the baggie, Bates observed that it contained a white rocky substance that field tested positive as crack cocaine. Simultaneously, Officer Hammer returned from the police vehicle and informed Officer Bates that [he] had found an outstanding summary warrant on Appellant. Officer Bates placed Appellant under arrest and conducted a search incident to arrest. The search uncovered $905 in U.S. Currency, four clear plastic bags similar to the bag that held the suspected cocaine, and two other baggies with the corner torn off similar to the type used to fill, tie and deliver crack cocaine.

Based on the information gathered during the search, Officer Bates applied for and obtained a search warrant for the vehicle that was executed at approximately 4:15 p.m. the next day. During the search of the vehicle, police uncovered a silver and black 320 Beretta automatic handgun with four rounds of ammunition loaded in the gun and one round in the gun's chamber. The gun was located in the pocket on the back of the front passenger's seat. In the middle console of the vehicle, Officer Bates found a single baggie of a green leafy substance that field tested positive as marijuana. Also found in the console was a clear baggie inside a Newport brand cigarette box that contained a white rocky substance that field tested positive as crack cocaine and an operational digital scale. The registration for the vehicle was retrieved from the glove box and indicated [Appellant] as the owner and confirmed that the vehicle was registered under the license plate found on the vehicle.

Appellant testified to the following version of events of April 7, 2012. Appellant was exiting an apartment he had been visiting in Hall Manor when he ran into [Sellers] on the way to his car. [Sellers] asked and Appellant agreed to give him a ride around the corner so he went to the driver's side back seat to move newly purchased auto parts into the trunk of the car. He was in Hall Manor to deliver an asthma pump to the mother of

his son. Appellant stated that an unidentified female walked by and spoke with [Sellers] which resulted in Sellers asking him to give the female a ride to the Paxton Street Pub. Appellant then took a child's booster seat out of the rear passenger side seat and placed it into his trunk to enable the female to enter the back seat. He then turned around, and saw an individual approaching him on the sidewalk. He testified that the person came up to him with a gun drawn and told him to put his hands up. Appellant was ordered to the ground and handcuffed. When Appellant was told by the police officer that he was seeking [Sellers], Appellant informed him of his name and gave him access to his identification in the form of a driver's license located in his back pocket. At the same time that Appellant was interacting with the police officer, Sellers ran from the vehicle at the time additional police units, including Officer Bates, converged in front of the Chrysler automobile. When he asked why he was being held, the officer said to "run his name" as it had not been confirmed that the other individual on the scene was Sellers. Appellant denie[d] having a baggie sticking out of his pocket while he was seated on the curb and handcuffed. He also denie[d] attempting to shove anything in his pocket. Appellant testified that he told the detaining officer that the handcuffs were cutting off his circulation and aggravating an injured shoulder. Appellant stated that [the officer] was getting ready to do something when Officer Bates came out of nowhere telling him he's reaching, he's reaching and went into Appellant's pocket and pulled out a bag.

(Suppression Court Opinion, 1/23/14, at 4-9) (record citations, quotation marks, and footnotes omitted).

On September 10, 2012, Appellant filed a motion to suppress. A hearing took placed on December 19, 2012. On December 27, 2012, the suppression court denied the motion. On January 28, 2013, trial counsel sought leave to withdraw. The trial court granted the motion on January 31, 2013. On February 21, 2013, Appellant, acting *pro se*, filed an appeal of the order denying his motion to suppress. On April 4, 2013, new counsel

entered his appearance on behalf of Appellant. On April 22, 2013, this Court *sua sponte* quashed Appellant's *pro se* appeal as premature. (**See Commonwealth v. Robertson**, 420 MDA 2013, unpublished order).

A jury trial commenced on September 10, 2013.

> During the initial trial, Appellant chose to testify on his own behalf and was advised of his rights. [The trial court] asked if there was any *crimen falsi* that could be used against Appellant. The prosecutor responded, "No *crimen falsi*. Just a prior felony drug charge that may or — may or may not come in, depending on the circumstances." [The trial court] responded, "Well, it depends on whether he opens the door or not. And that'll be explained to you by [defense counsel]."
>
> Thereafter, during direct examination, Appellant testified that, "I have a history of drug use." The following conversation took place on the record:
>
> > [Defense Counsel]: After you were — after you were detained and taken to the Harrisburg booking center, were you asked if you were — if you had used drugs or were a drug dealer?
> >
> > Appellant: Yes.
> >
> > *   *   *
> >
> > [Defense Counsel]: And what was your response?
> >
> > Appellant: Yes.
> >
> > [Defense Counsel]: That you are a drug user?
> >
> > Appellant: Yes.
>
> During cross-examination, the Commonwealth asked the following:
>
> > Commonwealth: And you also testified that you have a history of drug use and you're a cocaine user?

Appellant:  Correct.

Commonwealth:    You  were  convicted  of  dealing cocaine in 2009.

[Defense Counsel]:  Objection. Move for a mistrial.

Appellant moved for the mistrial.  The Commonwealth argued against mistrial in that Appellant opened the door to the testimony in question.  Therefore, the Commonwealth would be prejudiced if they were not allowed to introduce such evidence. [Defense counsel] argued that the door was not opened by Appellant's testimony because there was no indication he sold drugs, but rather just used drugs.    Initially, [the trial court] denied the mistrial and permitted counsel to give closing arguments.   However, after thorough review of the record, consideration of the arguments presented by counsel thereon, and prior to the jury returning a verdict, [the trial court] decided to grant the mistrial.

(Trial Court Opinion, 12/16/13, at 8-9) (record citations and quotation marks omitted).

Immediately prior to the start of the second trial, Appellant, although represented by counsel, made an oral *pro se* motion to dismiss the complaint, which the trial court denied.  (**See** N.T. Trial, 9/18/13, at 4).  On September 19, 2013, the jury convicted Appellant of the aforementioned offenses.[2]  That same day, at Appellant's request, the trial court sentenced Appellant to an aggregate term of incarceration of not less than one nor more than three years to be followed by a two-year term of probation. (**See**

_____

[2]  The jury acquitted Appellant of two firearms offenses and the Commonwealth withdrew a charge of tampering with evidence.

N.T. Sentencing, 9/19/13, at 3, 8-9). The trial court also granted defense counsel's request to withdraw. (*See id.* at 14-15).

On September 24, 2013, Appellant, acting *pro se*, filed a notice of appeal. On October 1, 2013, new counsel filed an appeal on Appellant's behalf. Also on October 1, 2013, the trial court ordered Appellant to file a concise statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(b). On October 9, 2013, new counsel sought leave to withdraw. On October 10, 2013, counsel forwarded Appellant's *pro se* Rule 1925(b) statement to the trial court. On October 15, 2013, counsel withdrew the second appeal. On October 31, 2013, the trial court granted counsel's motion to withdraw and issued a new concise statement order. On November 8, 2013, Appellant, acting *pro se*, filed a new Rule 1925(b) statement. On December 16, 2013, and January 23, 2013, the trial court and the suppression court, respectively, filed opinions pursuant to Pa.R.A.P. 1925(a). On May 21, 2014, new counsel entered his appearance on behalf of Appellant.

On appeal, Appellant raises the following questions for our review.

A. Whether the suppression court erred by denying Appellant's suppression motion where the Commonwealth failed to meet their [sic] burden that a confidential informant's tip alone gave police reasonable suspicion for a warrantless detention of Appellant?

B. Whether the suppression court erred by denying Appellant's suppression motion where Harrisburg police lacked reasonable suspicion to hold Appellant in continued detention after he provided identification dispelling any suspicion that

he was the person wanted that they were searching for and a pat down showed he was not armed and dangerous?

C. Whether the suppression court erred by denying Appellant's suppression motion on grounds that an officer reaching into Appellant's pocket to retrieve a baggie containing crack cocaine was justified under the plain view exception to the warrant requirement where the officer saw only the tip of a sandwich bag protruding from Appellant's pocket and did not see any contraband until after he removed the baggie?

D. Whether the trial court erred by denying Appellant's motion to dismiss the complaint under double jeopardy barring retrial of a defendant once he has received a mistrial provoked by prosecutorial misconduct under the state and federal constitutions?

(Appellant's Brief, at 5).

Appellant's first three issues challenge the denial of his motion to suppress. (*See* Appellant's Brief, at 16-38). When we review a ruling on a motion to suppress, "[w]e must determine whether the record supports the suppression court's factual findings and the legitimacy of the inferences and legal conclusions drawn from these findings." *Commonwealth v. Holton*, 906 A.2d 1246, 1249 (Pa. Super. 2006), *appeal denied*, 918 A.2d 743 (Pa. 2007) (citation omitted). Because the suppression court in the instant matter found for the prosecution, we will consider only the testimony of the prosecution's witnesses and any uncontradicted evidence supplied by Appellant. *See id.* If the evidence supports the suppression court's factual findings, we can reverse only if there is a mistake in the legal conclusions drawn by the suppression court. *See id.*

In his first claim, Appellant contends that "[t]he confidential informant's tip lacked reasonable suspicion to justify a **Terry** [**v. Ohio**, 392 U.S. 1 (1968)] stop." (Appellant's Brief, at 16). Initially we note that this Court has held that there are three levels of interaction between citizens and police officers: (1) mere encounter, (2) investigative detention, and (3) custodial detention. **See Commonwealth v. Jones**, 874 A.2d 108, 116 (Pa. Super. 2005). Thus, we have stated:

> A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond.
>
> In contrast, an investigative detention, by implication, carries an official compulsion to stop and respond, but the detention is temporary, unless it results in the formation of probable cause for arrest, and does not possess the coercive conditions consistent with a formal arrest. Since this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity. In further contrast, a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest.

**Id.** (citation omitted).

Here, the Commonwealth concedes that the stop of Appellant and Sellers, based on the CI's tip, was an investigative detention. (**See** Commonwealth's Brief, at 18). Thus, the police needed reasonable suspicion to detain Appellant. **See Jones**, **supra** at 116.

In discussing the "reasonable suspicion" standard, the Pennsylvania Supreme Court has explained:

> [t]his standard, less stringent than probable cause, is commonly known as reasonable suspicion. In order to determine whether the police officer has reasonable suspicion, the totality of the circumstances must be considered. In making this determination, we must give due weight . . . to the specific reasonable inferences [the police officer] is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

*Commonwealth v. Rogers*, 849 A.2d 1185, 1189 (Pa. 2004) (internal quotation marks and citations omitted). Because we agree that Appellant was seized within the meaning of the Fourth Amendment and Article I, Section 8, we must decide whether there were "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed] that intrusion." *Commonwealth v. Lewis*, 636 A.2d 619, 623 (Pa. 1994) (quoting *Terry*, *supra* at 21). It is settled that information provided by a CI can be sufficient to justify a *Terry* stop. *See Commonwealth v. Griffin*, 954 A.2d 648, 651 (Pa. Super. 2008), *appeal denied*, 967 A.2d 958 (Pa. 2009).

> When determining whether such information is enough to meet the standard, the court should use a totality of the circumstances test. Three factors relevant to the analysis are: the veracity of the informant, the reliability of the information, and the informant's basis of knowledge. Though not strict requirements, these factors help determine how much faith law enforcement can place in the information they are given.

*Id.* (quotation marks and citations omitted). In applying this test, it is important to take into account whether the informant is known or

- 11 -

anonymous and "[i]f an informant is able to provide details about the future actions not ordinarily easily predicted, then the information is considered to have a higher degree of reliability." *See id.* (citations and internal quotation marks omitted).  The final factor, the basis of knowledge, "refers to how the informant obtained the information.  The more intimate the basis of knowledge, the more likely the information is to be trustworthy." *See id.* at 651-52 (citations omitted).  Further,

> [t]hese factors serve as a starting point for our analysis. However, in a totality of the circumstances test, other factors may also be taken into account to form the basis of a *Terry* stop.  Innocent facts, when taken together, may combine to give a police officer reasonable suspicion. Moreover, we must give due weight . . . to the specific reasonable inferences [the police officer] is entitled to draw from the facts in light of his experience.

*Id.* at 652 (citations and quotation marks omitted).

Here, APO Banning testified that he knew the informant by name. (*See* N.T. Suppression Hearing, 12/19/12, at 11).  Thus, the fact that APO Banning knew him gives substantial weight to the veracity of the information since a known informant "is far less likely to provide false information out of fear of reprisal." *Griffin*, *supra* at 651 (citation omitted).  Further, the CI told APO Banning that Sellers would be in the area of 17 Row Hall Manor, traveling with Appellant, who drove a green Chrysler.  (*See* N.T. Suppression Hearing, 12/19/12, at 11-12).  Lastly, the informant said to APO Banning that Sellers had an outstanding warrant for simple assault. (*See id.* at 11-13).  APO Banning then relayed this information to his

- 12 -

partner in the Harrisburg Street Crimes Unit, Officer Bates. (***See id.*** at 7, 9, 23-24).

APO Banning and Officer Bates found Appellant and Sellers in between 16 and 17 Row Hall Manor, returning to Appellant's green Chrysler; Appellant was the driver and Sellers was the passenger. (***See id.*** at 15, 25, 63-65). Appellant was the registered owner of the car. (***See id.*** at 25). Thus, the CI predicted a future event, which was not readily known, making the tip more reliable. ***See Griffin***, ***supra*** at 651. While APO Banning did not know the CI's basis of knowledge, that information is not determinative of a finding of reasonable suspicion. ***See id.*** Here, the informant was known to APO Banning and the informant accurately predicted future information not readily known to the public. Thus we find that the trial court did not err in determining that information provided by the CI constituted sufficient reasonable suspicion to support a ***Terry*** stop.[3] ***See Griffin***, ***supra***

_____

[3] The thrust of Appellant's argument is that the tip was a "second-hand tip" and our courts have found such tips lack reasonable suspicion where they provide only "innocent details" about a suspect. (Appellant's Brief, at 16; ***see also id.*** at 17). However, the cases cited by Appellant, ***Commonwealth v. Allen***, 725 A.2d 737 (Pa. 1999), *cert. denied*, 528 U.S. 922 (1999); ***Commonwealth v. Jackson***, 698 A.2d 571 (Pa. 1997); and ***Commonwealth v. Jones***, 845 A.2d 821 (Pa. Super. 2004), are inapposite. In ***Allen***, the case involved a situation where the information was not given directly from the informant to one of the parties involved with the arrest, but rather given to a third party who relayed it to the police. ***See Allen***, ***supra*** at 740. In ***Jackson***, the tip was anonymous and vague. ***See Jackson***, ***supra*** at 575. Finally, in ***Jones***, while the informant gave a name to the police dispatcher, the tip was an uncorroborated vague one that the
*(Footnote Continued Next Page)*

at 652 (holding trial court erred in granting motion to suppress, where informant was known to police officer and events corroborated informant's information).  Appellant's first claim lacks merit.

In his second claim, Appellant alleges that the police "lacked reasonable suspicion to hold Appellant in continued detention after he provided identification dispelling any suspicion that he was Corey Sellers." (Appellant's Brief, at 25).  However, Appellant's argument is largely based on his belief that the tip from the CI did not create reasonable suspicion, (*see* Appellant's Brief, at 25-28), a claim we have rejected.

Here, as discussed above, the police had reasonable suspicion to stop Appellant based on the CI's tip.  Further, at the time of the stop, the officers knew that Sellers had an outstanding warrant from a violent crime and that he had prior criminal history involving possession of guns and drugs.  (N.T. Suppression Hearing, 12/19/12, at 13-14).  The stop took place late at night in a high-crime area; in fact, there had been a shootout in the next row. (*See id.* at 8, 28-29).   The police were unsure which person was Appellant and which was Sellers; when police approached Appellant's vehicle, the passenger, later identified as Sellers, fled.  (*See id.* at 29-31).  Given this, there was sufficient reasonable suspicion to justify the handcuffing, stop, and frisk of Appellant.  *See Commonwealth v. Bryant*, 866 A.2d 1143,

_(Footnote Continued)_ ───────────────

defendant was involved in "drug activity."  *Jones*, *supra* at 825.  As discussed above, this was not the case in the instant matter.

- 14 -

1147 (Pa. Super. 2005), *appeal denied*, 876 A.2d 392 (Pa. 2005) (under totality of circumstances, even where police did not personally observe criminal activity, combination of location in high crime area, people fleeing, and hearing gunfire noises was sufficient to justify *Terry* stop and protective frisk for weapons).

Appellant argues, however, that once he gave the police officer his driver's license, there was no longer any justification for his continued detention. (*See* Appellant's Brief, at 30-31). We disagree.

Officer Bates testified that Police Officer Hammer[4] left Appellant handcuffed, when he obtained identity information from Appellant and went to verify it. (*See* N.T. Suppression Hearing, 12/19/12, at 32-33). Appellant has not pointed to any case that states that a police officer cannot continue an investigative detention supported by reasonable suspicion while he or she verifies information provided by Appellant.[5] To find that immediately upon a detainee handing over some piece of allegedly identifying information, a police officer must take the detainee's word for it and end the detention without verifying the information would lead to an absurd result. Here, the

_____

[4] Hammer's first name is not given in the record.

[5] The cases cited by Appellant to support his claim are not on point, because both involve detentions without reasonable suspicion of criminal activity. *See Commonwealth v. Peterson*, 17 A.3d 935, 939 (Pa. Super. 2011), *appeal denied*, 29 A.3d 372 (Pa. 2011); *Commonwealth v. Hudson*, 995 A.2d 1253, 1259 (Pa. Super. 2010). This is not the case in the instant matter.

initial detention was supported by reasonable suspicion and the police officer was within his right to continue the investigtion until he verified that the identity information provided by Appellant was accurate, at which time he discovered the existence of an outstanding warrant, which gave him probable cause to arrest Appellant. (*See* N.T. Suppression Hearing, 12/19/12, at 33, 35). Thus, the trial court did not err in determining that there was sufficient reasonable suspicion to support a stop, frisk, and continued investigative detention of Appellant. *See Bryant*, *supra* at 1147. Appellant's second claim lacks merit.

In his third claim, Appellant contends that the trial court erred in finding that the plain view exception to the warrant requirement applied to the instant matter, because the item seized was in Appellant's pocket, not in plain view. (*See* Appellant's Brief, at 34). This Court has stated that: "[p]ursuant to the plain view doctrine, the warrantless seizure of a piece of evidence is justified when (1) the officer is at a lawful vantage-point, (2) the incriminating character of the object is immediately apparent, and (3) the officer has a lawful right of access to the object." *Commonwealth v. Wilson*, 927 A.2d 279, 287 (Pa. Super. 2007) (citations omitted).

For the reasons discussed below, we find that while the police officer was at a lawful vantage point and the incriminating character of the object was immediately apparent, the officer did not have a lawful right of access to the object. *See Wilson*, *supra* at 285-88. Therefore, the trial court

erred in finding that Officer Bates properly seized the baggie under the plain view exception. However, we affirm the denial of suppression because Officer Bates would have inevitably discovered the baggie following Appellant's arrest on the summary warrant.[6]

Here, we have already determined that there was reasonable suspicion to justify a **Terry** stop. Thus, Officer Bates was at a lawful vantage point, standing near Appellant, when he observed the baggie protruding from his pocket, and Appellant trying to conceal it. (**See** N.T. Suppression Hearing, 12/19/12, at 34).

Further, as discussed above, the **Terry** stop took placed in a high-crime, high-drug area, and Officer Bates testified that: "Almost a hundred percent of my arrests on people if they had a sandwich bag on them; it is usually used for drugs or drug paraphernalia. It said to me that it was drug paraphernalia." (**Id.** at 35). "A police officer has probable cause to believe that an object is incriminating where the facts available to the officer would warrant a man of reasonable caution in the belief, that certain items may be contraband or stolen property or useful as evidence of a crime[.]" **Commonwealth v. Wright**, 99 A.3d 565, 569 (Pa. Super. 2014) (internal quotation marks and citation omitted). It is evident, that when we consider

_____

[6] An appellate court may affirm order of trial court on any basis if decision is correct. **See Commonwealth v. Hernandez**, 886 A.2d 231, 240 (Pa. Super. 2005), *appeal denied*, 889 A.2d 1122 (Pa. 2006).

the combination of the neighborhood, Appellant's attempt to conceal the baggie, and Officer Bates' past experiences, the incriminating nature of the object was immediately apparent.

However, in cases that do not involve a motor vehicle, "the lawful right of access prong is established by evidence of exigent circumstances requiring immediate seizure without a warrant." ***Commonwealth v. Brown***, 23 A.3d 544, 553 n.7 (Pa. Super. 2011) (*en banc*) (internal quotation marks and citations omitted). Our decision in ***Wilson*** is instructive.

In ***Wilson***, following a motor vehicle stop and after observing the defendant make furtive movements, a police officer performed a pat-down search. ***See Wilson***, ***supra*** at 283. After feeling a large object in the defendant's pocket, the officer looked inside the pocket and saw that the object was a ball of crack cocaine; he then retrieved the cocaine and placed the defendant under arrest. ***See id.*** While finding that the initial pat down was lawful, this Court found that the police officer exceeded the permissible bounds of a ***Terry*** frisk when he looked into the defendant's pocket and retrieved the crack cocaine. ***See id.*** at 285-86. We stated, "[n]othing in ***Terry*** can be understood to allow . . . any search [whatsoever] for anything but weapons." ***Id.*** at 286 (citation omitted).

We then held that the drugs were not admissible under either the plain feel or the plain view exceptions. ***See id.*** at 286-87. Relying on the

- 18 -

Pennsylvania Supreme Court's plurality opinion in ***Commonwealth v. Graham***, 721 A.2d 1075 (Pa. 1998), we reiterated that "plain view is perhaps better understood . . . not as an independent exception to the warrant clause, but simply as an extension of whatever the prior justification for an officer's access to an object may be." ***Wilson***, ***supra*** at 287 (quoting ***Graham***, ***supra*** at 1079). Thus, we held that once the police officer ascertained that the defendant

> was not armed and dangerous . . . any continued search exceeded the scope authorized under ***Terry***. Because [the police officer's] prior justification for access to the object in [the defendant's] pocket had expired under ***Terry***, he had no independent justification to extend the search, *i.e.*, look into [the defendant's] front pocket. Therefore, [s]ince the plain view doctrine cannot justify extending a warrantless search, we conclude that it does not validate [the police officer's] subsequent search of [the defendant's] front pocket and seizure of the drugs.

***Id.*** at 288 (citations and quotation marks omitted).

Here, Appellant was handcuffed and subject to an investigatory detention. (***See*** N.T. Suppression Hearing, 12/19/12, at 31-33). Officer Bates did not testify that he believed Appellant to be armed and dangerous or that he felt any weapons during any initial ***Terry*** frisk of Appellant. (***See id.***). We see nothing in the record that would explain what exigent circumstances gave Officer Bates the lawful right to access Appellant's pocket. (***See id.*** at 31-35); ***see Wilson***, 285-88. Thus, the trial court erred in finding that Officer Bates lawfully seized the baggie under the plain view doctrine. ***See id.***

However, this does not end our inquiry. Even though Officer Bates did not lawfully seize the baggie under the plain view doctrine, he would have discovered the baggie on Appellant's person when he searched him incident to his arrest based upon the outstanding summary warrant. Thus, the baggie would fall within the inevitable discovery exception. *See* ***Commonwealth v. Van Winkle***, 880 A.2d 1280, 1285-86 (Pa. Super. 2005), *appeal denied*, 898 A.2d 1071 (Pa. 2006), (although pat-down search of automobile passenger exceeded permissible scope of ***Terry*** frisk, contraband discovered was admissible under inevitable discovery exception as police had probable cause to arrest passenger after finding cocaine under his seat during lawful search of vehicle). Thus, for the reason discussed above, Appellant's third issue lacks merit. ***See id.***

In his final claim, Appellant contends that the trial court erred in not granting his motion to dismiss the case on double jeopardy grounds where the Commonwealth committed prosecutorial misconduct resulting in a mistrial at Appellant's first trial. (***See*** Appellant's Brief, at 38-41). We disagree.

Initially, we question whether Appellant preserved this issue for appeal. Appellant did not file a written motion to dismiss based upon double jeopardy grounds. Rather, the record reflects that immediately prior to jury selection for the second trial, while represented by counsel, Appellant, acting *pro se*, stated, "At this time Your Honor, I just want to — I want to make a

- 20 -

motion to dismiss this complaint under —", at which point the trial court cut him off and denied the motion. (N.T. Trial, 9/18/13, at 4).

It is well settled under Pennsylvania law that there is no right to hybrid representation either at trial or on the appellate level. **See Commonwealth v. Padilla**, 80 A.3d 1238, 1259 (Pa. 2013), *cert. denied*, 134 S. Ct. 2725 (2014). Thus, Appellant had no authority to make a *pro se* motion to dismiss and the trial court properly denied the motion. Further, because of this, Appellant never stated his grounds for the motion; therefore, we have no way of knowing if he sought dismissal on double jeopardy grounds.

The first time Appellant raised the double jeopardy issue was in his Rule 1925(b) statement. (**See** Rule 1925(b) Statement, 11/08/13, at 2). An Appellant cannot raise an issue for the first time in a Rule 1925(b) statement. **See Commonwealth v. Coleman**, 19 A.3d 1111, 1118 (Pa. Super. 2011) (issues raised for the first time in a Rule 1925(b) Statement are waived); **see also** Pa.R.A.P. 302(a); **Commonwealth v. Hanford**, 937 A.2d 1094, 1098 n.3 (Pa. Super. 2007), *appeal denied*, 956 A.2d 432 (Pa. 2008) (new legal theories cannot be raised for the first time on appeal). Appellant's double jeopardy claim is waived.

Moreover, the claim is without merit. "An appeal grounded in double jeopardy raises a question of constitutional law. Thi[s c]ourt's scope of review in making a determination on a question of law is, as always,

plenary. As with all questions of law, the appellate standard of review is *de novo*. . . ." ***Commonwealth v. Anderson***, 38 A.3d 828, 833-34 (Pa. Super. 2011) (*en banc*) (quotation marks and citations omitted).

The Pennsylvania Constitution provides, in pertinent part, that "No person shall, for the same offense be twice put in jeopardy of life or limb. . . . " Pa. Const. Art. 1 § 10. We have held that:

> . . . double jeopardy protection applies where the prosecution engages in conduct intended to provoke the defendant's motion for mistrial. In addition, the Pennsylvania Supreme Court held that double jeopardy applies in the event of prosecutorial misconduct undertaken in bad faith to prejudice or harass the defendant. . . .
>
> > We now hold that the double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial.
>
> Thus, the Pennsylvania Supreme Court held that the double jeopardy clause set forth in Article 1, § 10 of the state constitution provides greater protection than its Fifth Amendment counterpart.

***Commonwealth v. Minnis***, 83 A.3d 1047, 1051-52 (Pa. Super. 2014) (*en banc*) (quotation marks, footnote and citations omitted).

In describing the type of prosecutorial misconduct that would implicate double jeopardy concerns, this Court has stated:

> Prosecutorial misconduct includes actions intentionally designed to provoke the defendant into moving for a mistrial or conduct by the prosecution intentionally undertaken to prejudice the defendant to the point where he has been denied a fair trial.

- 22 -

[**Commonwealth v.**] **Smith**, [532 Pa. 177,] 186, 615 A.2d [321,] 325 [(1992)]. The double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant subjected to the kind of prosecutorial misconduct intended to subvert a defendant's constitutional rights. However, **Smith** did not create a *per se* bar to retrial in all cases of intentional prosecutorial overreaching. Rather, the **Smith** Court primarily was concerned with prosecution tactics, which actually were designed to demean or subvert the truth seeking process. The **Smith** standard precludes retrial where the prosecutor's conduct evidences intent to so prejudice the defendant as to deny him a fair trial. A fair trial, of course is not a perfect trial. Errors can and do occur. That is why our judicial system provides for appellate review to rectify such errors. However, where the prosecutor's conduct changes from mere error to intentionally subverting the court process, then a fair trial is denied. **See Commonwealth v. Martorano & Daidone** [sic], 453 Pa. Super. 550, 684 A.2d 179, 184 (1996), *affirmed*[,] 559 Pa. 533, 741 A.2d 1221 (1999). "A fair trial is not simply a lofty goal, it is a constitutional mandate, ... [and][w]here that constitutional mandate is ignored by the Commonwealth, we cannot simply turn a blind eye and give the Commonwealth another opportunity." **Martorano**, 559 Pa. at 539, 741 A.2d at 1223 (quoting **Martorano & Daidone**, 684 A.2d at 184).

**Commonwealth v. Culver**, 51 A.3d 866, 883 (Pa. Super. 2012) (some quotation marks and citations omitted).

In **Smith**, following direct appeal, the defendant discovered that the prosecutor had withheld information regarding a favorable sentencing recommendation given to the prosecution's chief witness and that the prosecution had knowingly withheld exculpatory physical evidence.[7] **See Smith**, *supa* 615 A.2d at 322-23.

_____

[7]At trial, the Commonwealth "excoriated" a Commonwealth witness who testified about the existence of the physical evidence in question. The
*(Footnote Continued Next Page)*

In **_Martorano_**, the Pennsylvania Supreme Court held that double jeopardy barred retrial of the defendant where the prosecutor committed misconduct including, "blatantly disregarding the trial court's evidentiary rulings, disparaging the integrity of the trial court in the front of the jury, and repeatedly alluding to evidence that the prosecutor knew did not exist." **_Martorano_**, **_supra_** 741 A.2d at 1222.

By contrast, in **_Culver_**, this Court held that double jeopardy did not bar retrial of the defendant despite prosecutorial misconduct. **_See Culver_**, **_supra_** at 883-84. The prosecutor in **_Culver_** physically and verbally menaced the defendant; attacked the defendant's veracity during closing argument; referred to evidence that did not exist during opening argument; and repeatedly asked leading questions during direct examination of Commonwealth witnesses. **_See id._** at 871-72. Although this particular prosecutor had a history of misconduct and while we deplored his actions, we found that the conduct was not so egregious as to bar retrial on double jeopardy grounds. **_See id._** at 884. We stated, "[w]e cannot discern a clear intent to deprive Culver of a fair trial where [the prosecutor's] misconduct could largely be explained by his incompetence or mere indifference to the

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯

Commonwealth implied that the witness had fabricated his testimony, presented the testimony of other witnesses which contradicted the testimony, and recommended that the witness be prosecuted for perjury. **_Smith_**, **_supra_** at 323.

rights of the accused and the decorum of the court, and where there is also no direct evidence to the contrary." ***Id.***

Thus, it is evident that the bar is a high one and that for prosecutorial misconduct to prohibit retrial on double jeopardy grounds the prosecutor's conduct must be both egregious and pervasive. Here, the trial court stated that, while it found the remedy of a mistrial appropriate after the Commonwealth questioned Appellant about his prior drug conviction, it did not believe that the prosecutor's conduct was so egregious as to bar retrying Appellant. (***See*** Trial Ct. Op., 12/16/13, at 9). Specifically, the trial court stated, "[i]t did not appear that the prosecutor intentionally blurted out Appellant's prior conviction, but rather honestly believed Appellant opened the door to this particular line of questioning. The prosecutor did not act intentionally to deprive Appellant of a fair trial. The statement was not intended to provoke Appellant into requesting a mistrial." (***Id.***). After thoroughly reviewing the record in this matter, we agree. At most, the record demonstrates that the prosecutor misapprehended the trial court's ruling about Appellant's prior conviction, and the trial court, in an abundance of caution, granted a mistrial. (***See*** N.T. Trial, 9/10/13, at 23, 114, 122, 134; N.T. Trial 9/11/13, at 165-66). This is not the type of pervasive misconduct that this Court found to bar retrial in ***Smith*** and ***Martorano***. Appellant's claims that double jeopardy bars retrial in this matter because of prosecutorial misconduct lacks merit. ***See Culver***, ***supra*** at 883.

Accordingly, for the reasons discussed above, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/16/2014